## C. A. DUNHAM CO. v. WARREN WEBSTER & CO.

(District Court, D. New Jersey.   June 9, 1913.)

PATENTS (§ 328*)—INFRINGEMENT—THERMOSTATIC CONTROLLER.

The Dunham patent, No. 865,171, for a thermostatic controller, construed in the light of the prior art and of the specification, which states that it is for an improvement on the devices of prior patents to the patentee, must be limited to the specific construction shown and described. Claim 3, as so limited, contains nothing disclosing invention aside from a plate in the expansion disk to act as a brace and prevent the collapse of the walls of the disk.  As so construed, the claim *held* not infringed.

In Equity.   Suit by the C. A. Dunham Company against Warren Webster & Co.   On final hearing.   Decree for defendant.

Robert W. Hardie, of New York City, for complainant.

Francis C. Lowthrop, of Trenton, N. J. (Francis T. Chambers and John E. Hubbell, both of Philadelphia, Pa., of counsel), for defendant.

CROSS, District Judge.   The defendant, Warren Webster & Co., is charged by the complainant in this suit with having infringed patent No. 865,171, now owned by it, but which was issued February 3, 1907, to one C. A. Dunham, for a thermostatic controller.   The principal defenses set up are want of novelty and invention in the subject-matter of the patent, and noninfringement.   In the view taken of the case, it will be necessary to consider only the question of infringement.

In the patent in suit, Dunham, the patentee, states that he had previously taken out two patents relating to the same general subject-matter.   Thus he says:

"My present invention relates to an improvement in thermostatically operated controlling devices of the same general design as those disclosed in my prior patents, Nos. 735,733, August 11, 1903, and 753,557, March 1, 1904. The invention is useful primarily as a steam trap, but it is also useful with controlling valves and other devices in various connections where it is desired to operate the valve or other device according to temperature changes. The object of my present invention is principally to improve the construction and assemblage of the chambered expansion disk which is employed to actuate the valve or other member, rendering the expansion disk more sensitive and at the same time more durable and easier of operation than such disks previously constructed."

From this extract it undeniably appears that the invention of the patent in suit was, at the most, but an improvement upon what was embraced in, and protected by, other patents previously obtained by the patentee.   The patent itself, therefore, goes far, as indeed it well might, towards answering the present contention of the complainant that it covers an invention of a broad and basic character.

Turning for a moment to Dunham's three patents, and considering them in the order of their issue, it will be noticed that the first relates, as the patentee says, to improvements in drain valves or traps of that class, which are equipped with thermostatic devices that automatically open and close the movable valve member by a change in the temperature of the fluid admitted to the valve chamber, such a con-

struction of valve being especially adapted, according to the specification, for use in connection with steam engine separators, heating systems, radiators, steam cookers, and other places where a regular trap is not available, after which follows the patentee's statement of the object of his invention. His patent of 1904 is for a "steam trap," of which he says:

"The present invention relates to improvements in drain valves and steam traps of the general class disclosed by my prior application for letters patent filed July 5, 1902, serial number 114,485"—

while the patent in suit, as has already been shown, does not purport to embrace anything more than an improvement upon the devices of his earlier patents. It thus appears that, although Dunham selected a different name for the devices of his several patents, they nevertheless admittedly embraced nothing more than improvements to the thermostatic controller of the prior art. The one described in the Dunham patents comprises a disk called a "chambered expansion disk," formed of two thin sheet metal plates, each of them stamped into a cupped form with corrugations and having their peripheral edges closely and securely joined together by a lapped and soldered joint. The chamber of the expansion disk thus formed by the union of such metal sheets is charged, as in the prior art, with a volatile and preferably a liquid substance, such as ammonia. The fluid placed in the chamber, must be one readily vaporizable, so that when and as it becomes warmed it will be wholly or partially vaporized, thereby pressing apart the thin corrugated plates which form the chamber, which plates will moreover, through the spring of the metal, upon the condensation of the vapor, contract and resume their normal position. The corrugated metal forming this chamber must obviously be thin, so as to be readily capable of expansion.

At this point it may be well to quote claim 3 of the patent in suit, which is the only one in issue.

"(3) In a thermostatic controller, a chambered expansion disk and a plate in the disk set edgewise against its walls and forming a brace to resist the collapse of the disk."

The 1903 patent of Dunham had no brace on the inside of the chambered expansion disk, or indeed any stop of any kind to check the collapse of the disk, which consequently was free to collapse to any extent demanded by an excess of pressure on the outside of the chamber over that on the inside. The second or 1904 patent, however, had a tubular stop centrally located, whereby the contraction of the disk at its center as the result of outside pressure was controlled and limited; while in the patent in suit, instead of the tubular stop of the patent last referred to, we find that each of the corrugated plates which form the expansion disk, has affixed on its inner side, at its center, what is styled a "plug." These plugs are opposite to each other, so that, when the expansion disk has collapsed to a sufficient extent, their inner ends meet and prevent its further collapse.

Complainant's counsel strongly contends that claim 3 is a broad one. A cursory examination of it, however, in connection with Dunham's previous patents, not to mention others in the prior art, will show

that the only possible advance thereby suggested is "a plate in the disk *set edgewise against its walls* and forming a brace to resist the collapse of the disk." Both of his earlier patents were for a thermostatic controller in which there was a "chambered expansion disk," essentially like that of the patent in suit, while the patent of 1904, and several others in the prior art, showed a stop designed among other things, to prevent the collapse of such a disk. But, aside from the prior art, it cannot be that any remarkable inventive advance was shown by merely so adjusting a brace as to prevent the collapse of the walls of the expansion chamber, if and when they should be exposed to undue pressure from without.

If the roof of a shed were in danger of collapse, either from an excessive weight of snow resting thereon, or from any other cause, the person who should suggest putting one or more props or braces, no matter what their form, under the roof to prevent or limit such collapse, would be in little danger of being called a genius, and yet such a suggestion would be about as inventive, and in view of the prior art possibly more, than that of the claim in suit. Hence, because of the number and variety of supports and stops previously shown in the very art now being considered, it is clear that the complainant, if claim 3 is to be upheld, must be satisfied with substantially that particular form of brace or stop claimed, described, and shown in the specification and drawings of its patent. This is not to say that other features covered by other claims of the patent in suit may not render its controller valuable. It is sufficient at this time to declare that no such feature or element has been discovered in claim 3, the comparatively narrow scope of which has already been referred to, and is in fact demonstrated, in part at least, by the following language taken from the specification:

"In order to assist the juxtaposed plugs *25* and *28* in the function of preventing the collapse of the expansion disk, particularly at the outer portions of the disks where the plugs are not effective, I provide spreader plates *38*. These plates, as shown in Fig. 3, have a marginal form corresponding to the corrugations in the plates *21* and *22*, and are fitted snugly within the expansion disk, so that, upon any undue movement of the plates toward each other, said plates will engage the spreaders or braces and their further movement will be arrested. The plates are disposed radially, as shown in Fig. 4."

The plate or support of claim 3, it will thus be noticed, is *set edgewise against its walls* (those of the disk) and in the specification is called a "spreader plate"; its declared function being merely "to assist the juxtaposed plugs *25* and *28* in the function of preventing the collapse of the expansion disk, particularly at the outer portion of the disk where the plugs are not effective." These spreader plates are therefore manifestly distinct entities, separate and apart from the plugs whose function it is their province to aid. That such is their function, and their only function, is not only outlined in the specification, but specifically declared by the claim itself.

The matter in issue in this suit being admittedly confined to claim 3, it is impossible to understand why a very considerable portion of complainant's record in this case was ever made. Divers heating systems have been learnedly and interestingly discussed by witnesses

and counsel; but what these several systems, or the more or less intricate apparatus necessary to their operation and maintenance have to do with the plate or prop of claim 3 has not been made manifest. Nor is the controversy over one or other of the various kinds of thermostatic controller, or over the complainant's type of expansion disk, since the same kind of disk appeared not only in Dunham's previous patents, but in other patents still earlier; nor, again, are we at all concerned with the scope or validity of any of the 11 claims of the patent, other than of claim 3. In short the matter in issue, as has just been said, is so well defined by the terms of that claim, construed as they must be in the light of the prior art, that we repeat it is extremely difficult to understand why so much ado has been made over what seem to be absolutely irrevelant and immaterial matters.

Since the exact form of brace called for by claim 3 and shown and described in the specification and drawings does not appear in the prior art, it will be assumed, for the purpose of this suit, notwithstanding, what has been said, that that claim discloses novelty and invention. But with this much assumed, the question still remains has the defendant infringed it? The defendant's construction, unlike the complainant's, is not of the diaphragm kind; that is, it is not made of corrugated plates united at their edges to form a chambered expansion disk, but is of a type well recognized in the prior art and known as the "bellows type," consisting of a metallic bellows, cylindrical in form, the ends of which are secured to top and bottom plates of unyielding metal; the bellows being adapted to be filled with a vaporizable fluid and operated as a thermostatic controller. There are many patents in the prior art covering the flexible diaphragm type of controller, such as the one in suit, and there are also many others of the bellows type. It is, however, unnecessary to discuss them in detail. An ordinary observer after a casual inspection, would readily distinguish and correctly classify them. Undoubtedly the defendant had a perfect right to adopt and use, as it did, the bellows type without at all trenching upon the complainant's rights. It merely followed Dunham's prior patents and other patents still earlier, so that the only questions for consideration are, whether the defendant has adopted and used the "plate" or stop of the third claim, and, if it has, did it set it edgewise against the walls of the chambered disk.

As a matter of fact, the only stop it uses is a tubular stop centrally located and attached to one of the solid end plates, but so attached that it in no wise touches, much less rests against or supports, the side, or collapsible part, of the bellows, which is the only part of defendant's expansion disk that can seriously be claimed to represent the chambered expansion disk of complainant's patent. The defendant's stop may repeatedly be found in the prior art, sometimes in the form of a solid block, sometimes in the form of a spring and sometimes in a tubular form, and located not only at the center but at points between the center and periphery of the expansion chamber. For instance, in patent No. 141,063, to Maxim and Hawes for a steam trap issued in 1873, considerably over 30 years prior to the patent in suit, there was shown what was called an "expansion vessel," containing alcohol or

other easily evaporating fluid designed to operate a valve, for the purpose and in the manner of the patent in suit; within which expansion vessel there was, moreover, located a cylindrical block of wood of a "length sufficient to prevent the sides of the vessel being injured by collapsing by the external pressure." It is, moreover, perfectly manifest, as has been shown, that claim 3, interpreted in the light of the specification, recognizes not only a stop consisting of the plugs centrally located which are not unlike the defendant's in principle, but also an additional stop or brace set edgewise against the walls of the expansion disk to assist the centrally located plugs in preventing its collapse. Since then, the defendant uses but one type of stop, and that an old one in form and function, and since its stop is not set edgewise against the walls of the expansion disk as called for by claim 3, it cannot be, and is not, included within its terms.

It seems unnecessary to consider the prior art in detail. A casual inspection of it will show that the claim in suit can only be upheld by giving it a narrow construction. To hold that the defendant's construction infringes it would require it to be so broadly construed that it would run counter to the prior art, to its own destruction. Defendant's expert has also shown that the tubular support of the defendant's device has the additional function of controlling and centering the valve upon the valve seat. No such function exists or can be claimed for the device of claim 3; hence, in form, location, and function the defendant's stop or brace is totally unlike the one therein referred to. Furthermore, and finally, the complainant shows two kinds of braces, stops, or supports, the defendant but one.

The bill will be dismissed, with costs, upon the ground of noninfringement.